UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X
JAY SIMON

       Plaintiff,                  <u>MEMORANDUM AND ORDER</u>

  -against-                  Civil Action No.
                                 01-CV-6024(DGT)(LB)
N.Y.C. BOARD OF EDUCATION

       Defendant.

-------------------------------X

Trager, J:


    Plaintiff Jay Simon ("plaintiff"), acting <u>pro</u> <u>se</u>, brings
this action against his former employer, New York City Board of
Education ("BOE" or "defendant"), pursuant to Title VII of the
Civil Rights Act of 1964 ("Title VII"). Plaintiff alleges he
suffered discrimination based on his gender, male, and
retaliation for engaging in a protected activity. Defendant
moves for summary judgment pursuant to Fed. R. Civ. P. 56(c) on
both claims.


**Background**

    Plaintiff Jay Simon was a school aide employed on and off by
defendant at various New York City public schools since January
1989. <u>See</u> (Def.'s Mot. Summ. J. Ex. A, Deposition of Jay Simon,
conducted May 15, 2002 ("Pl. May 15 Dep.") at 16).

1

In September 1999, plaintiff was transferred to P.S. 16. Plaintiff began at P.S. 16 as a supervisory school aide, supervising 17 female school aides. (Pl. May 15 Dep. at 15, 45-46.) At P.S. 16, plaintiff initially reported to Principal Audrey Murphy ("Principal Murphy") and Assistant Principal Elizabeth Upton ("Assistant Principal Upton"), but in May 2000, Assistant Principal Upton was replaced by Assistant Principal Elaine Iodice ("Assistant Principal Iodice"). Id. at 46-48.

On January 12, 2001, plaintiff filed a charge of gender discrimination with the Equal Employment Opportunity Commissioner ("EEOC") claiming that individuals had placed disciplinary letters in his file with the intent to discriminate against him because he was a man. (Def.'s Ex. HH.) On April 24, 2001 plaintiff filed another charge with the EEOC claiming that defendant was retaliating against him by excluding him from meetings and suspending him from work. (Def.'s Ex. TT.) Then, on September 5, 2001, plaintiff filed the present complaint in federal court. (Def.'s Statement of Undisputed Facts at ¶ 76.)

Plaintiff remained in the position of supervisory school aide until October 2001, when he was terminated. Id. at 88-90. In November 2001, plaintiff filed another charge with the EEOC claiming that defendant retaliated against him by terminating his employment. (Def.'s Ex. YY.) Thereafter, in March 2002 plaintiff filed an amended complaint in the present matter,

adding a claim for retaliation in connection with his termination. (Def.'s Ex. BBB.)

In this motion defendant seeks summary judgment on both plaintiff's discrimination and retaliation claims. Defendant alleges that plaintiff cannot show a prima face case for either claim and, even if he could, defendant argues that its actions were in fact legitimate and non-discriminatory in nature. In support of these claims, defendant submitted numerous exhibits, but in reply, plaintiff only submitted a handwritten letter accompanied by his markings on several other letters.

First, the reasons for plaintiff's termination, organized thematically, will be reviewed in section (1) of this background. Thereafter, in section (2), the facts underlying plaintiff's allegations and termination are organized chronologically. Unless otherwise noted, plaintiff in his deposition and submissions does not specifically contest defendant's accounts.

**(1)**

### Alleged Reasons for Plaintiff's Termination

Plaintiff's October 2001 termination letter, written by Deputy Superintendent August Saccoccio("Deputy Superintendent Saccoccio"), alleged that plaintiff was terminated based on his verbal abuse toward students and staff, insubordination, unsatisfactory performance, excessive absenteeism, and refusal to submit to a medical examination by the BOE's medical bureau.

3

(Def.'s Ex. XX.)  According to defendant, plaintiff's termination was justified because they had received numerous complaints concerning plaintiff's work and had issued several written warnings to him.  Plaintiff disputes the BOE's stated rationale for terminating him, arguing that he never did any of the acts that defendants claim he did.  Instead he asserts that he was initially discriminated against because he was a man and then terminated as retaliation against him for filing a gender discrimination lawsuit.  (Pl.'s Reply at 1.)

**A. Verbal abuse toward students**

The first reason cited by the BOE for terminating plaintiff was plaintiff's alleged verbal abuse toward students.  (Def.'s Ex. XX.)  In May 2000, shortly after Assistant Principal Iodice began working at P.S. 16, she observed plaintiff line up approximately twenty children in the hallway, scream at them and deprive them of lunch.  (Def.'s Ex. C, Deposition of Elaine Iodice, ("Iodice Dep.") at 37, 83.)  Assistant Principal Iodice met with plaintiff on May 18, 2000 to discuss this incident and sent him a letter dated May 26, 2000 memorializing the discussion.  (Def.'s Ex. J.)

In addition to this incident, Assistant Principal Iodice observed on another occasion plaintiff using foul language in front of the children, banging his hand on the table, and yelling into a bullhorn very close to the children's faces.  (Iodice Dep.

at 42-43.) Plaintiff, at his deposition in connection with this case, denied having screamed at the children, but admitted to raising his voice. (Def.'s Ex. B, Deposition of Jay Simon, conducted Oct. 18, 2002 ("Pl. Oct. 18 Dep.") at 49.) Plaintiff also denied using foul language around the children, though he did state that he occasionally slammed a book on a table in the cafeteria in order to "bring the children in line." (Pl. Oct. 18 Dep. at 51, 56.) Plaintiff testified he did this "[b]ecause the [other] school aides weren't doing their job and Ms. Iodice wasn't doing her job." Id. at 59. Plaintiff admitted in his deposition to using the bullhorn two to three feet away from a child, but then denied it later in the deposition. Id. at 51-54.

In the month of June 2000, P.S. 16's administration received ten letters from school aides complaining about plaintiff's treatment of the students. (Def.'s Ex. L.) The letters reported that plaintiff: screamed at children for talking; used foul language in front of children; removed children from their seats while their lunches remained uneaten; closed the bathrooms while 10-15 minutes of lunch remained, causing children to urinate on themselves; and made children sweep floors and clean tables with buckets of water and bleach. Id. Furthermore, one school aide saw children crying because they were afraid of plaintiff. Id.

In that same month, P.S. 16's administration also received twenty-six letters from fifth grade students complaining about

plaintiff. (Def.'s Ex. K.) The letters from the students alleged that plaintiff: cursed in a low voice; screamed at them with the bullhorn; and told a misbehaving student that plaintiff would break his arm. Id.

**B. Verbal abuse toward staff**

In addition to verbally abusing students, the BOE also alleged that plaintiff verbally abused various members of the staff at P.S. 16, particularly the other school aides. (Def.'s Ex. L.) The complaint letters from school aides alleged that plaintiff used profanity when referring to certain school aides, screamed at them and called them derogatory names like "imbecile" or "idiot." Id. On occasion he told the school aides to "move their asses" and that if they went "over his head" there would be "problems." Id. Plaintiff also threatened to fire all the school aides if they didn't do things "his way." Id. Plaintiff never denied these statements and contended at his deposition that the other school aides stood around "doing nothing" while he did their jobs and that when he complained to Assistant Principal Iodice about this she would "laugh in his face." (Pl. May 15 Dep. at 75.)

On June 27, 2000, Principal Murphy and Assistant Principal Iodice met with plaintiff, and wrote a letter to be placed in his file memorializing the meeting. (Def.'s Ex. M.) Among the issues documented in the letter were plaintiff's use of foul

language, verbal abuse toward students and staff, and his speaking in a condescending manner, as well as threatening to write up or terminate school staff. Id. Plaintiff, in his deposition, said he did not speak at the meeting, but signed the letter on June 28, 2000, and attached a hand-written letter in which he denied or attempted to justify each allegation. (Id.; Def.'s Ex. N.)

## C. Insubordination

The third reason cited by the BOE for plaintiff's termination was insubordination. (Def.'s Ex. XX.) According to Assistant Principal Maria Mannetta ("Assistant Principal Mannetta"), plaintiff took an unauthorized lunch, refused to stay late when asked and left the building without punching out. (Def.'s Ex. O.) After one incident, Principal Murphy wrote a letter to plaintiff alerting him that he had failed to pick up attendance cards. (Def.'s Ex. Z.) In response, plaintiff called Assistant Principal Mannetta and told her that she was not going to ruin his holiday. He said: "You'll see I'll take care of you. You'll hear from my lawyer." (Def.'s Ex. DD.)

Furthermore, on March 9, 2001, Assistant Principal Mannetta reprimanded plaintiff because he was writing notes at the cafeteria table during a lunch period instead of standing at the cafeteria exit to ensure safety. (Def.'s Ex. MM.) On both March 16, 2001 and March 28, 2001, plaintiff left the school without

permission during his shift. (Def.'s Ex. NN.) On March 20, 2001
Principal Murphy suspended plaintiff for five days without pay
due to the March 16 incident. Id.

## D. Unsatisfactory performance

In plaintiff's termination letter the BOE also alleged that
plaintiff performed unsatisfactorily as a supervisory school
aide. (Def.'s Ex. XX.) Letters submitted by defendant detail a
number of incidents. On one occasion, while assigned to the
security desk, plaintiff failed to sign in visitors. (Def.'s
Ex. T.) During another incident, plaintiff failed to stop an
unauthorized adult from entering the cafeteria and did not listen
to a school aide trying to call his attention to the unauthorized
person. (Def.'s Ex. Y.) On another occasion, plaintiff failed
to count the children during two lunch periods as he had been
instructed to do. (Def.'s Ex. R.) According to plaintiff, the
counting of the children "slipped his mind" because he was in
charge of "other things." (Pl. Oct. 18 Dep. at 61.)
Furthermore, plaintiff failed to inform Assistant Principal
Mannetta or anyone else about several fights which had taken
place in the cafeteria. (Def.'s Ex. MM.)

**E. Excessive absenteeism and refusal to submit to medical exam**

In the termination letter, defendant further stated that plaintiff was excessively absent and refused to submit to a medical exam. (Def.'s Ex. XX.) Plaintiff was absent 126 out of 181 school days between September 2000 and June 2001. <u>Id.</u> On December 8, 2000 Principal Murphy wrote a letter to Superintendent Joseph Quinn ("Superintendent Quinn") requesting that plaintiff be sent for a medical evaluation since he had been absent eighteen and a half days since September and had become sick while at work. (Def.'s Ex. X.) The medical bureau responded on December 26, directing plaintiff to appear for a medical exam scheduled for January 17. (Def.'s Ex. AA.) On January 8, 2001 plaintiff submitted a note from his doctor advising that plaintiff should rest until January 18, 2001. (Def.'s Ex. FF.) On January 17, 2001 the BOE medical bureau examined plaintiff and requested additional medical documentation. (Def.'s Ex. GG.) On February 15, 2001, the Medical Bureau sent a letter to Superintendent Quinn stating that plaintiff was fit for service. (Def.'s Ex. JJ.) Plaintiff, however, did not return to work until early March. (Def.'s Statement of Undisputed Facts at ¶ 56.)

On March 28, 2001 plaintiff claimed he slipped on water in the cafeteria. (Def.'s Ex. PP.) When plaintiff went to

Principal Murphy's office immediately after the accident, he told her that he had hurt his back while mopping. (Def.'s Ex. PP.) Principal Murphy offered to call an ambulance, but plaintiff refused and said that he was leaving. _Id._ Three school aides later wrote statements which insinuated that plaintiff did not have an accident, that instead they saw plaintiff putting water on the floor with the mop and forming puddles immediately prior to this incident. (Def.'s Ex. PP.)

Subsequent to the March 28 accident, defendant received a letter from plaintiff's chiropractor asking for plaintiff to be excused from work from March 28, 2001 until April 5, 2001. (Def.'s Ex. QQ.) On April 2, 2001 Principal Murphy arranged for plaintiff to be examined again by the BOE Medical Division and ordered him to appear at the examination. (Def.'s Ex. RR.) Plaintiff did not appear. (Def.'s Ex. RR.)

Plaintiff returned to work on April 6, 2001. In plaintiff's April 24, 2001 retaliation claim to the EEOC, he stated that, at the time, Principal Murphy told him he could not work until he went to the medical board and that he had one half-hour to get there. (Def.'s Ex. TT.) He stated that this made him so upset that he blacked out and then went to the emergency room. _Id._ However, his deposition contradicts this version of the events. Plaintiff stated in his depostion, that Principal Murphy ordered

him to go to the medical board within an hour. (Pl. May 15 Dep.
at 82.) Concerned about getting there on time, plaintiff claimed
that he was driving too fast in the rain and hit a light pole,
then drove himself to the hospital. (_Id._ at 79-82.) Plaintiff
never returned to work at P.S. 16 after this incident. During
Easter break of that year (April 7-15), plaintiff claimed he
called the medical board for an appointment, but that his call
was not returned.

When plaintiff failed to return to work on April 23, 2001,
Principal Murphy's secretary called plaintiff and inquired as to
why he was still not at work. Plaintiff responded that he was
waiting for an appointment from the medical board. _Id._ After
this call, plaintiff scheduled an appointment with the medical
board for April 27, 2001 and although he appeared, he failed to
cooperate with the doctor and was not examined. (Def.'s Ex. AAA
at 2.) Plaintiff's termination letter recounted a statement from
Yvonne Joseph ("Joseph"), an administrator at the Medical Bureau.
Joseph had stated that plaintiff showed up for the exam, but
proceeded to threaten her and the doctor and left without being
examined. (Def.'s Ex. XX.) By contrast, plaintiff alleged that
when he went for the examination he had to wait three hours to be
examined and that "they were verbally abusive" to him. (Def.'s
Ex. XX.)

**Plaintiff's Termination**

**A. Plaintiff's EEOC Complaint**

Although plaintiff does not dispute all the reasons set forth by the BOE for his termination, he still alleges that he was discriminated against on the basis of his gender. (Def.'s Ex. TT.) As evidence of this discrimination, plaintiff claims that Assistant Principal Iodice did not speak to him and excluded him from meetings with other school aides. (Pl. May 15 Dep. at 48-49.) Plaintiff asserts that he never had any problems at P.S. 16 when he reported to Assistant Principal Upton, before she was replaced by Assistant Principal Iodice. (Pl. May 15 Dep. at 53.) Furthermore, plaintiff claimed that at least three school aides told him that Assistant Principal Iodice was "out to get him" and wanted him "out of here" because of his gender. Id. at 51-52, 54, 131-132. When pressed, though, plaintiff refused to provide the names of those school aids because he did not "want to get them in trouble." Id. at 52.

Plaintiff also claims that his responsibilities changed when Assistant Principal Iodice took over. When plaintiff first began working at P.S. 16, he made out the schedule for the school aides. When Assistant Principal Iodice began working there, she began making out the schedule and assigned plaintiff to "pick up

the bus kids," a task that plaintiff felt was not in accord with his role as supervisory school aide. Id. at 17-19.

On January 2, 2001 plaintiff wrote a letter to the Department of Education's Office of Equal Opportunity alleging that the disciplinary letters in his file were a form of gender discrimination. (Def.'s Ex. BB.) He also alleged gender harassment, in that he received additional work assignments, was doing school aide work instead of supervisory aide work and was excluded from meetings. (Def.'s Ex. CC.) On January 12, 2001 plaintiff filed a charge of gender discrimination with the EEOC, alleging that he was treated differently from the other school aides and was harassed through numerous disciplinary letters. (Def.'s Ex. HH.)

On April 24, 2001 plaintiff filed another charge with the EEOC claiming that defendant was retaliating against him for filing the gender discrimination charge. (Def.'s Ex. CC.) Plaintiff cited as retaliatory acts: his exclusion from meetings and his March 2001 five day suspension for leaving school without permission. See id. He also claimed that Principal Murphy's order to go to the medical board in April, 2001 was an act of retaliation. Id. On June 7, 2001 the EEOC mailed plaintiff a "Dismissal and Notice of Rights" statement regarding his discrimination and retaliation charges; the statement declared

that the EEOC was unable to conclude that defendant's acts were a violation of Title VII.  (Def.'s Ex. WW.)

## B. Plaintiff's Termination

On June 29, 2001 Deputy Superintendent Saccoccio and Principal Murphy met with plaintiff and plaintiff's union representative to discuss the disciplinary charges against plaintiff.  (See Def.'s Ex. XX.)  This meeting was the culmination of the numerous warnings plaintiff had received over the previous year.  Plaintiff claims that he was wrongly accused and that he did not do any of the acts alleged in the various disciplinary letters against him.  Id.  However, other than his denials, plaintiff has presented no evidence to refute the accuracy of the disciplinary letters.

On September 5, 2001 plaintiff filed and served the present complaint in federal court, alleging gender discrimination. (Def.'s Statement of Undisputed Facts at ¶ 76.)  On October 12, 2001 Saccoccio held another meeting with plaintiff and plaintiff's union representative, informing them that because of the allegations discussed at the June 29 meeting, there was good reason to terminate plaintiff.  (Def.'s Ex. XX.)  In November 2001, plaintiff filed another charge with the EEOC claiming that defendant retaliated against him by terminating his employment.  (Def.'s Ex. YY.)  On February 13, 2002, EEOC issued

a right to sue letter with respect to the retaliation claim.
(Def.'s Ex. BBB.)  In March 2002 plaintiff filed an amended
complaint in the present matter, adding a claim for retaliation
in connection with his termination.  (Def.'s Ex. BBB.)

## Discussion

In a summary judgment motion, the moving party must show
that no genuine issue of material fact exists.  However, the
party opposing summary judgment must set forth "specific facts
showing that there is a genuine issue for trial."  Fed. R. Civ.
P. 56(e).  In Title VII cases, bare allegations of discrimination
"devoid of specifics, but replete with conclusions" are not
enough to defeat summary judgment.  See Bickerstaff v. Vassar
Coll., 196 F.3d 435, 452 (2d Cir. 1999).  Pro se complaints are
to be construed liberally during the summary judgment phase.
Haines v. Kerner, 404 U.S. 519, 520 (1972).

### (1)

### Gender Discrimination

Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§§ 2000e to 2000e-17, makes it unlawful "for an employer . . . to
discharge any individual or otherwise discriminate against any
individual with respect to his compensation, terms, conditions,
or privileges of employment, because of such individual's . . .

sex." 42 U.S.C. § 2000e-2(a)(1). Plaintiff's employment discrimination claim under this section is governed by the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 (2d Cir. 2000). In order to successfully bring a claim under Title VII, plaintiff must meet the initial burden of establishing a prima facie case of discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802. The elements of a prima face case are: (1) that plaintiff belongs to a protected class; (2) that plaintiff was performing his duties satisfactorily; (3) that plaintiff suffered an adverse employment action; and (4) that the action occurred in circumstances giving rise to an inference of discrimination on the basis of membership in that class. <u>McLee v. Chrysler Corp.</u>, 109 F.3d 130, 134 (2d Cir. 1997).

If plaintiff provides sufficient evidence to establish a prima facie case, the burden will then shift to defendant to articulate a legitimate, non-discriminatory reason for the employment decision in question. <u>McDonnell Douglas</u>, 411 U.S. at 802. If the defendant establishes a non-discriminatory reason, then the burden shifts back to the plaintiff to point to evidence that shows the employer's stated reason to be a mere pretext and that the employer's actual motive was discriminatory in nature. See <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143

16

(2000).  In analyzing whether the employer's stated reason was actually just a pretext for discrimination, a number of different factors must be weighed.  "Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered[.]"  <u>Reeves</u>, 530 U.S. at 148-9; <u>see also</u> <u>Schnabel v. Abramson</u>, 232 F.3d 83, 90 (2d Cir. 2000) (analyzing <u>Reeves</u>). However, plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that . . . more likely than not [discrimination] was the real reason for the discharge.'"  <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 714 (2d Cir. 1996) (<u>quoting</u> <u>Woroski v. Nashua Corp.</u>, 31 F.3d 105, 110 (2d Cir. 1994)).  Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  <u>Reeves</u>, 530 U.S. at 143 (<u>quoting</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)).

**a. Plaintiff's prima facie case**

Plaintiff claims that defendant discriminated against him on the basis of his gender.  He meets the first prong of the prima facie case for gender based discrimination because he is a male.

Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d
Cir. 2001) (finding that a male who had applied for but was
denied a teaching position was a member of a protected class).
Defendant, however, argues that plaintiff has failed to establish
the second prong of the prima facie case: that he was qualified
for the job.  Normally, this might be a question of fact.
However, given the record presented by defendant, and plaintiff's
unsupported denials in response, it would appear that plaintiff
was not performing his job satisfactorily.

As to the third prong of the prima face case, plaintiff does
not identify with precision what he considers the adverse
employment action to have been.  Based on his complaints to the
EEOC and his deposition, plaintiff appears to argue that changes
in his job duties and the disciplinary letters against him both
constituted adverse employment actions.

To qualify as an adverse employment action, a change in
working conditions must be "more disruptive than a mere
inconvenience or an alteration of job responsibilities."  Galabya
v. New York City Board of Education, 202 F.3d 636, 640 (2d Cir.
2000).  Since plaintiff's loss of his "scheduling duties" and his
receipt of "school aide work" are merely an alteration of job
responsibilities, they do not rise to the level of adverse
employment actions.  Id.

As to plaintiff's other alleged adverse employment action, the disciplinary letters, although some courts have held that such letters by themselves can constitute adverse employment actions, <u>see</u> <u>Little v. Nat'l Broad. Co.</u>, 210 F. Supp. 2d 330, 387 (S.D.N.Y. 2002), many courts have held that written warnings alone do not constitute adverse employment actions unless they lead to a materially adverse change in terms and conditions of employment. <u>See</u> <u>Weeks v. New York State Div. Of Parole</u>, 273 F.3d 76, 86 (2d Cir. 2001) (<u>abrogated on other grounds by</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 535 U.S. 101 (2002)). The disciplinary letters in this case ultimately lead to plaintiff's termination, as a result the letters should be viewed as adverse employment actions under the third prong of the prima face case.

Under the fourth prong, though, plaintiff has failed to shown a connection between the letters and his gender. Although plaintiff alleges that three school aides told him that Assistant Principal Iodice was "out to get him," he makes no claim that Assistant Principal Iodice herself said anything like that to him directly. He offers no affidavits from any of the three aides to support this statement; he even refuses to provide the names of the school aids in question.

Nonetheless, the standard for establishing a prima facie case is de minimis. <u>Zimmermann v. Associates First Capital</u>

<u>Corp.</u>, 251 F.3d 376, 381 (2d Cir. 2001). As a result, plaintiff's denials might be sufficient to establish a prima facie case, though insufficient to overcome defendant's summary judgment motion as a whole.

**c. Defendant's Legitimate, Non-Discriminatory Reason and Plaintiff's Response**

Even assuming plaintiff has shown a prima facie case of discrimination, defendant has articulated a legitimate, non-discriminatory reason for its actions. Defendant's detailed record provides numerous reasons beyond gender discrimination for why the letters were placed in plaintiff's file. Defendant's verbal abuse towards students and staff, insubordination, unsatisfactory job performance, excessive absenteeism, and refusal to submit to a medical examination by the BOE's medical bureau are all non-discriminatory reasons for putting the disciplinary letters into plaintiff's file.

As defendant has thus provided a legitimate, non-discriminatory reason for the letters, the burden shifts back to plaintiff to show that defendant's stated reason is actually a pretext for an illegal discriminatory motive. Plaintiff, however, offers no tangible evidence that indicates that defendant's numerous documented reasons for the disciplinary letters were all merely pretext for gender discrimination.

As noted, plaintiff claims, but does not support with other

20

evidence, that three school aides told him that Assistant

Principal Iodice was "out to get him" because of his gender.

(Pl. May 15 Dep. at 54.)  Under the Federal Rules of Civil

Procedure, plaintiff is not required to produce affidavits in

order to surmount summary judgment.  Fed. R. Civ. P. 56(e).

Nonetheless, his path to victory can not be paved by mere

conjecture or speculation.  Bickerstaff, 196 F.3d at 451-52

(stating that conclusory allegations of discrimination

unsupported by other affidavits or verifiable particulars are

insufficient to defeat summary judgment).  A plaintiff must set

forth specific facts to defeat summary judgment.  Schwapp v. Town

of Avon, 118 F.3d 106, 111 (2d Cir 1997) (holding that where

affidavits made "bald assertions and legal conclusions" devoid of

specifics that the district court was right to not rely on them).

In this matter, plaintiff offers no specific information

concerning the other school aids' statements, not even their

names.  If plaintiff could produce testimony or affidavits from

these school aides that might be sufficient, but plaintiff's bald

assertions that the statements were made are insufficient to

overcome summary judgment.

Plaintiff also argues that some of the written complaints

against him were false.  However, in the face of defendant's

detailed record, plaintiff again presents no evidentiary

materials to support his claim.  Plaintiff's denials lack detail

and specificity.  As a result, these bare denials of the

incidents giving rise to termination, without more, are

insufficient to defeat summary judgment.  Arqugliaro v. Brooks

Brothers, Inc., 927 F. Supp. 741, 745-47 (S.D.N.Y. 1996)

(granting defendant summary judgment where plaintiff, suing for

gender discrimination, only stated in conclusory fashion, without

giving any details, that accusations of sexual harassment against

him were false).

Since plaintiff's claims are completely unsupported, he has

not presented enough evidence for a rational jury to find that

the reasons cited by defendant were not the real reasons for his

discharge.  Accordingly, summary judgment for plaintiff's gender

discrimination claim must be granted.

**(2)**

**Hostile Work Environment**

To the extent that plaintiff's gender discrimination claim

can also be construed as a hostile work environment claim, it

also must fail.  To prove hostile work environment plaintiff must

show:  "conduct (1) that is 'objectively' severe or pervasive-

that . . . creates an environment that a reasonable person would

find hostile or abusive . . . " Gregory v. Daly, 243 F.3d 687,

691 (2d Cir. 2001).  This requirement is frequently referred to

as the 'objective' requirement.  An environment is hostile under Title VII when a workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). Defendant's warnings to plaintiff, the loss of plaintiff's scheduling duties, and the assignment to plaintiff of school aide work do not rise to the level of an objectively hostile work environment.  See Richardson v. New York State Dept. of Correctional Service, 180 F.3d 426, 437 (2d Cir. 1999).

**(3)**

**Retaliation**

In addition to direct discrimination, Title VII also makes it unlawful for an employer to discriminate against an employee "because he has made a charge . . . in an investigation, proceeding, or hearing under this subchapter," 42 U.S.C. § 2000e-3(a).  This statute "protects employees in the filing of formal charges of discrimination," Matima v. Celli, 228 F.3d 68, 78 (2d Cir. 2000), so long as the employee has "a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (internal quotations omitted) (emphasis omitted).  So even in this case where the underlying claim has

been shown to be meritless, a retaliation claim can still survive.

The test for retaliation follows the <u>McDonnell Douglas</u> burden shifting analysis laid out above. <u>Id</u>. To establish a prima facie case of retaliation, plaintiff must show: (1) participation in a protected activity known to the defendant; (2) defendant had knowledge of the protected activity; (3) an adverse employment action suffered by plaintiff; and (4) a causal connection between the protected activity and the adverse employment action. <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005) (<u>citing</u> <u>McMenemy v. City of Rochester</u>, 241 F.3d 279, 282-83 (2d Cir.2001)).

**a. Parties' Arguments**

Plaintiff alleges that defendant took several actions against him in retaliation for filing this gender discrimination lawsuit. (Def.'s Ex. BBB.) According to plaintiff, after he brought his first EEOC complaint in January 2001 Assistant Principal Iodice started excluding him from meetings and Principle Murphy would not allow him to return to work. In addition just over two weeks after the BOE was served with this lawsuit plaintiff was terminated. (Pl. May 15 Dep. at 150-151.)

Defendant, in response, argues that plaintiff cannot fulfill the last part of the prima facie test: he cannot establish a

causal connection between his protected activity and any alleged
adverse employment action.  (Def.'s Mem. Law Supp. Mot. Summ. J.
at 11.)

**b.  Analysis of Retaliation Claim**

Plaintiff passes the first prong of the test to establish
the prima facie case of retaliation, in that he engaged in a
protected activity by filing gender discrimination complaints
with the EEOC and in federal court.[1]  As to the second prong,
defendant does not challenge the fact that it was served with the
EEOC complaints or the complaints in the present action.  Under
the third prong, plaintiff's exclusion from meetings does not
rise to the level of an adverse employment action.  <u>See</u> <u>Davis v.
Verizon Wireless</u>, 389 F. Supp. 2d 458, 479 (W.D.N.Y. 2005)
(holding that exclusion from meetings was not an adverse

---

[1] Defendant argues that when plaintiff made his complaints
to the EEOC he lacked a good faith belief that defendant's
actions were motivated by discriminatory animus.  In support of
this argument defendant cites to the fact that the complaints
were filed shortly after plaintiff had received letters stating
that his performance was unacceptable and that he may face
disciplinary actions.  Plaintiff has not directly addressed this
point.  However, in his depositions plaintiff claims that he
never did any of the actions that defendants claim lead to these
disciplinary letters, thereby indicating that he did poses a
belief that the letters were motivated by something other than
his poor performance.  In any event, because defendant has a
legitimate non-discriminatory reason for terminating plaintiff,
it is not necessary at this juncture to determine whether
plaintiff did indeed possess a good faith belief when he made his
complaints to the EEOC.

employment action).  That said, Principle Murphy allegedly

stopping him from returning to work and plaintiff's eventual

termination both rise to such a level.  Lovejoy-Wilson v. NOCO

Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001) (holding that

a suspension without pay constituted an adverse employment

action); Feingold v. New York, 366 F.3d 138, 156-57 (2d Cir.

2004) (holding that termination was an adverse employment

action).  Under the fourth prong, plaintiff does not assert any

direct evidence of retaliatory animus.  Instead he relies on the

close temporal proximity between his protected actions and the

adverse employment actions.  However, to establish such a

connection the temporal proximity must be "very close."  Clark

County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001); Hunter v.

St. Francis Hosp., 281 F. Supp. 2d 534, 547 (E.D.N.Y. 2003)

(quoting Clark County School District).  Plaintiff alleges that

Principle Murphy refused to allow him to work in April 2001, four

months after his EEOC filing, and that he was terminated just

over two weeks after the BOE was served with the complaint in

this matter.  The four month laps between the EEOC complaint and

Principle Murphy's actions is too long, in an of itself, to

establish a causal connection.  Hollander v. American Cyanamid

Co., 895 F.2d 80, 85-86 (2d Cir.1990) (holding that a three and

one-half month interval, without other evidence, was too long to

establish causation).  On the other hand the shorter period
between the serving of the complaint and the termination is
sufficient.  <u>Feingold</u>, 366 F.3d at 156-57 (finding that causal
connection was established where two weeks after plaintiff's
first internal complaint, his supervisors agreed to recommend his
termination).  Based on this analysis plaintiff has established a
prima facie case for retaliation related to his termination.

Having demonstrated a prima face case, the burden shifts to
defendant to articulate a legitimate non-discriminatory reason
for terminating plaintiff's employment.  <u>Terry v. Ashcroft</u>, 336
F.3d 128, 141 (2d Cir. 2003).  Defendant clearly meets this
burden.  Defendant contends that it discharged plaintiff because
of his documented verbal abuse toward students and staff,
insubordination, unsatisfactory performance, excessive
absenteeism and refusal to submit to a medical examination by the
BOE.  <u>See</u> <u>Van Zant</u>, 80 F.3d at 713-14 (finding that plaintiff's
poor performance evaluation before the filing of her EEOC
complaint and her subsequent refusal to come to the office to
discuss her paid leave situation provided non-discriminatory
reasons for her termination); <u>Brierly v. Deer Park Union Free</u>
<u>Sch. Dist.</u>, 359 F. Supp. 2d 275, 299 (E.D.N.Y. 2005) (holding
that summary judgment for defendant was proper where plaintiff
was not rehired for his position, in part, as a result of

warnings and negative evaluations in his personnel file).

With this showing, the burden again shifts back to plaintiff to put forth evidence that defendant's proffered reasons are just a pretext for retaliation.  See Quinn, 159 F.3d at 770. Plaintiff, though, has not put forth sufficient evidence from which a rational fact finder could conclude that defendant's explanation was a pretext.  Defendant began issuing warning letters to plaintiff as early as March 2000, nine months before plaintiff filed his first charge with the EEOC.  Plaintiff continued to accumulate verbal and written warnings until his termination.  Matima v. Celli, 228 F.3d 68, 79 ("An employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise.").  In the face of defendant's thorough record, plaintiff relies only on his conclusory denials of defendant's allegations and the fact that his termination followed his filing of the complaint by approximately just a few weeks.  This is not enough for a rational jury to ultimately conclude that plaintiff was fired in retaliation for filing this lawsuit.   See Bickerstaff, 196 F.3d at 451-52; Holt v. KMI-Continental, Inc., 95 F.3d 123, 130-31 (2d Cir. 1996) (affirming summary judgment where the plaintiff's only

showing of pretext was temporal proximity and the defendant asserted that they fired plaintiff for documented poor performance).  Thus, summary judgment dismissing plaintiff's claim of retaliation is appropriate.

**(4)**

### Possible Breach of Contract Claim

Because a pro se plaintiff's pleadings must be liberally construed, plaintiff's amended complaint may be understood as alleging a claim for breach of contract.  Although plaintiff did not explicitly plead breach of contract, his amended complaint appears to claim defendant breached its union contract with him. (Def.'s Ex. BBB.)  Plaintiff contends that after his dismissal hearing, the "Board of Education . . . [had] ten days to reply . . . ."  (Pl. May 15 Dep. at 99.)  Plaintiff alleges that the contract was violated when defendant failed to notify him ten days after his June 29, 2001 meeting with Deputy Superintendent Saccoccio.  Id. at 98-99.  In reviewing the contract, it is unclear to which portion plaintiff is referring when he claims that the BOE had tend days to respond.  However, since defendant is entitled to summary judgment on all plaintiff's federal claims, supplemental jurisdiction over a possible breach of contract claim will not be exercised.  See Brierly, 359 F. Supp. 2d 275, 302 (E.D.N.Y. 2005).

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted, and all of plaintiff's claims are dismissed with prejudice.  The Clerk of the Court is directed to close this case.


Dated:  Brooklyn, New York
        May 02, 2006


                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge